**Kenneth E. FINK, Defendant Below, Appellant,**

v.

**STATE of Delaware, Plaintiff Below Appellee.**

No. 344,2002.

Supreme Court of Delaware.

Submitted: Dec. 3, 2002.

Decided: Feb. 21, 2003.

Reargument and Rehearing En Banc Denied March 20, 2003.

Joseph A. Hurley, Wilmington, Delaware, for Appellant.

Elizabeth R. McFalan, Department of Justice, Wilmington, for Appellee.

Before WALSH, BERGER and STEELE, Justices.

STEELE, Justice.

In November 2001, a Superior Court jury convicted appellant Kenneth Fink of fifteen counts of Unlawfully Dealing in Materials Depicting a Child Engaged in a Prohibited Act[1] and fifteen counts of Possession of Child Pornography.[2] · The charges arose out of the discovery of child pornography on a computer compact disk and three zip disks seized from Fink's home. The seizure of child pornography occurred during the execution of the third of three search warrants. In this appeal, Fink asserts five grounds of error: (i) the search warrant was overbroad and lacked probable cause; (ii) the sentence of eight years at Supervision Level V was excessive; (iii) the prosecution of 30 counts violated Fink's rights against double jeopardy; (iv) the trial judge improperly instructed the jury; and (v) the statute under which the defendant was convicted is facially unconstitutional. We conclude that the defendant's arguments lack merit and that the convictions should be affirmed.

In April 1998, the Office of Disciplinary Counsel received a complaint from a co-executor of the estate of Patricia Zimmerman that Fink, an attorney admitted to the Delaware Bar, had unreasonably delayed probate of the estate. When the ODC contacted Fink, he indicated that a final accounting and closure of the estate would occur within one month. Fink failed to keep his promise, however, and in October 1999, the ODC arranged to have Fink's business financial records audited by an auditor for the Lawyers' Fund for Client Protection. The auditor discovered one check written from the Zimmerman estate funds payable to Fink in the amount of $40,000 and three other checks written to a company called Kamair. The four checks totaled $57,272.03 and none of the checks were authorized payments from the estate. The audit also revealed a deposit of three checks from the Kamair account into the estate account. Fink signed the three checks with the notation "personal funds." Fink also deposited $15,200 of his personal funds in the trust account on February 25, 2000. However, the total of Fink's and Kamair checks deposited in the Zimmerman estate account equated to $13,306.50 less than the amount of the four checks withdrawn from the estate account. The auditor concluded that the four checks drawn on the Zimmerman estate account payable to Fink and Kamair constituted unauthorized transfers of estate funds for Fink's benefit.

By letter dated February 29, 2000, Fink, through counsel, informed the ODC that he "borrowed" $40,000 from the Zimmerman estate to purchase an airplane for use in a private business. Records from the Office of the Secretary of State revealed that a corporation named Kamair Aviation, Inc., created by Fink in 1992, had been voided for non-payment of franchise taxes in March 1994. An Attorney General's subpoena also revealed Fink to be the authorized signer on a Kamair account at a local bank.

On March 7, 2000, this Court granted the ODC's petition to suspend Fink from the Delaware Bar for mishandling and converting client funds for personal use.[3] The

---

1. 11 *Del. C.* § 1109(4).

2. 11 *Del. C.* § 1111(1).

3. *In the Matter of a Member of the Bar of the Supreme Court,* 748 A.2d 913, 2000 Del. LEXIS 116 (Del.Supr.).

ODC also applied to the Court of Chancery for, and that Court granted, appointment of a receiver for Fink's law practice. While these actions were occurring, Fink filed a motion in opposition to the application for interim suspension of his law license. The motion stated that he represented approximately 40 clients in various matters and the motion included a list of those active matters.

On March 17, 2000, the receiver informed an investigator with the Office of the Attorney General that the co-executor of the estate of Jeanette Connell had contacted him. The co-executor reported that Fink was handling the Connell estate and that she read a newspaper article concerning Fink's suspension from the practice of law. The co-executor also reported that she contacted the bank that held the deposited funds and the bank stated that the all funds had been withdrawn and the account has been closed. The co-executor also told the receiver that Fink had performed the settlement of a real estate transfer between the estate of Jeanette Connell to Shirley McAllister totaling $46,783.35 and those funds were entrusted to Fink pending settlement of the Connell estate. The receiver investigated this information and learned that Fink closed the account holding the estate funds on December 2, 1999. The receiver reported to the investigator that: (1) Fink's list of open cases contained no mention of the names McAllister and Connell; (2) Fink had not turned over any files concerning the McAllister settlement or the Connell estate; and (3) Fink's law office contained no record of the files or accounts. The receiver further reported that he contacted the bank and personally confirmed that Fink transferred the funds into his law practice operating account and that Fink later transferred the funds into a money market account.

On March 20, 2000, the State obtained a warrant to search Fink's residence and car. The officer who signed the affidavit in support of the application reported that he had 20 years of experience as a police officer and 11 years experience as an investigator for the Attorney General. He concluded the affidavit by stating that it was his "experience from past investigations that personal financial records are maintained at the individuals residence" and that it "is not unusual for the sole proprietors of a business to take work or files home or maintain business records at their residence." The warrant authorized a search of the defendant's personal residence and car for the following:

Client files including but not limited to Estate of Jeanette Connell, Shirley McAllister, Patricia Zimmerman, banking or financial records of Kamair, Kamair Aviation, Inc., Artisans Bank account number 023701454, personal banking records or any financial or banking records involving the transfer, cashing or deposit of funds from any of the above or related transactions, personal banking records of Kenneth Fink whether held individually or jointly, lists or directories of names, telephones numbers and addresses, notes, memorandum, files, court documents or other related documents or documents indicating legal action taken by or for Kenneth Fink personally or as legal representative, files associated with Kamair, Kamair Aviation, Inc., or any other combination of Kamair, lease and or purchase agreements for any aircraft purchased by or thru Kenneth Fink or any company or corporation in his custody, either in written or electronic format which are evidence of a crime or crimes as outlined in the attached affidavit of probable cause.

The State executed the warrant the following day. The officers seized two desktop computers, two computer hard drives, forty-two zip discs, two CD Roms and three floppy disks from the defendant's home. On March 22, 2000, the State obtained a second warrant that authorized the search of the hard drives of the seized computers and the various disks and CDs. While searching a CD, the officer discovered a filed named Pre–Teen.jpg. The officer opened the file and discovered a picture of child pornography. The State then obtained a third warrant to search the same items for additional evidence of child pornography. The execution of the third warrant led to the discovery of more than 190 visual depictions of child pornography.

Before trial, Fink moved to suppress all the evidence, arguing that the warrant lacked sufficient particularity and was overbroad, and that there was no probable cause to search his home. The trial judge denied the motion, finding both probable cause and sufficient particularity. In this appeal, Fink reiterates the arguments presented before the trial judge.

■ Fink first contends that the search warrant did not meet the specificity requirements of either the federal or Delaware Constitutions, or the Delaware statutory mandates. Specifically, Fink alleges that the words in the warrant, "client files including, but not limited to," were too broad in scope and failed to adequately limit the search to those items for which probable cause had been established.

We agree with the trial judge's analysis and conclusion in his opinion that the language of the warrant was neither vague nor overly broad.[4]

A search warrant may be issued only upon a showing of probable cause.[5] In addition, a warrant must describe with particularity the place to be searched and the person or items to be seized.[6] "The purpose of requiring specificity in warrants is to avoid general exploratory searches, leaving little discretion to the officer executing the warrant."[7] In this case, the description of "client files including but not limited to" those specifically listed clients and the personal banking records of Fink are neither vague nor ambiguous. There is no question about what the searcher should have been seeking or that there were reasonable limitations inherent in the scope of the search. Items indicative of probable criminal conduct discovered during the scope of the search were properly seized under the specific terms of the warrant. Accordingly, Fink's argument that the warrant lacked specificity is without merit.

Fink next claims that the warrant was overbroad. Fink asserts that since he was accused of malfeasance with regard to the Zimmerman or McAllister estate, the State could search for those files only and not conduct a general search of all Fink's files. We disagree. Fink had represented in a court motion that he had approximately forty open cases. The investigator assigned by the Attorney General had knowledge of two additional open cases not disclosed by Fink. Neither case appeared in the files at Fink's office, nor had any files relating to these cases been provided to the receiver. Because Fink was under a court order to turn over all files to the receiver, any client files discovered at

---

4. *State v. Fink,* 2002 WL 312882 (Del.Super.).

5. U.S. Const. Amend. IV; Del. Const. art. 1, § 6.

6. *Id.*

7. Randy J. Holland, *The Delaware State Constitution: A Reference Guide* 37 (G. Allen Tarr, ed., 2002).

Fink's home would be evidence of a violation of a court order. Moreover, Fink's financial dealings involving transfers of client funds to a corporate account and Fink's personal and business accounts effectively opened all his financial records to potential scrutiny by the police. Finally, Fink's failure to turn over two files to the receiver provides a reasonable basis for the State and an independent magistrate to conclude that Fink may have additional files not disclosed and that those files could reasonably be found in Fink's home or office computer records. Accordingly, the warrant's authorized search did not unreasonably exceed a logical scope of inquiry.

■■■ Fink next asserts that the affidavit filed in support of the warrant lacked probable cause for an independent magistrate to conclude that evidentiary items would be found in the defendant's home. Specifically, Fink argues that "[w]hile the defendant concedes there was a showing of 'possible cause,' the lean material supporting probable cause in the affidavit did not establish a fair probability that those files would be found in the Fink residence."[8] In determining whether probable cause to obtain a search warrant existed, this Court has adopted a "totality of the circumstances" test.[9] The affidavit in support of a search warrant must set forth facts adequate for a judicial officer to form a reasonable belief that an offense has been committed and that seizable property would be found in a particular place.[10] The affidavit explains that Fink failed to comply with a court order to turn over all his files to a court-appointed receiver. Those files were not found with Fink's other client files at his office. The affidavit stated that Fink lived at the residence to be searched. The affidavit also stated that Fink "borrowed" money from a client's account and used it to buy an airplane for his own use. The second complainant had come forward only after she learned about Fink's suspension from the Delaware Bar in the newspaper and that the auditor investigating Fink's business records found discrepancies and evidence of misappropriation of client funds. Common sense combined with the investigator's statement that based on his investigative experience that sole proprietors often kept business files at their homes warranted the logical conclusion that the missing files could be at Fink's residence. Accordingly, we conclude that the affidavit contained ample information for the magistrate to conclude that it was reasonable that evidence of Fink's misappropriation of funds and noncompliance with a court order could be found at Fink's residence.

Fink next contends the charges were multiplicitous because a single offense was charged in more than one count of the indictment. Fink opines that the State could not prove that the child pornography images were obtained and "dealt" in separate and distinct downloads as opposed to being obtained all at once in a single import or download. In the absence of this proof, Fink maintains that he could be fairly convicted of only a single count based, apparently, on the theory that a collection of images could result in only a single charge. While he couches this argument within the rubric of "multiplicity," it appears to be an argument that the State could not establish a separate offense for dealing with each depiction unless it could prove beyond a reasonable

8. Appellant's Opening Brief at 18.

9. Hubbard v. State, 2001 WL 1089664, 2001 Del. LEXIS 385 (Del.Supr.).

10. 11 Del. C. § 2306; Dorsey v. State, 761 A.2d 807, 811 (Del.2000).

doubt that he downloaded (and therefore dealt) the depictions separately as opposed to one distinct download of them all. The State's inability to establish multiple downloads, Fink suggests, should bar conviction of 29 of the 30 counts in the indictment.

An additional multiplicity argument suggested by the reference to 29 of 30 counts, but not clearly articulated, is that one cannot be convicted of both possessing child pornography and of unlawfully "dealing" in child pornography for the same single depiction of a child in a prohibited act.

■ Whichever characterization or whatever restatement of his apparent argument correctly reconstructs them, the trial judge denied Fink's motion to dismiss 29 of the 30 counts, holding that the statute uses the term "visual depiction" in the singular and that each depiction constitutes a distinct occurrence of offensive conduct. Clearly the trial judge's ruling intended to address the first of the two arguments—the one offense for the "collection" as opposed to multiple offenses based on each individual image.' Neither the trial judge's ruling, the record nor Fink's argument before us resolves whether the merger of possession into dealing argument was ever fairly presented to the trial judge. This Court reviews Constitutional claims *de novo* to determine if the trial court committed an error of law.[11]

■ Constitutional prohibitions against double jeopardy prohibit the State from charging the same offense repetitively in several counts.[12] Fink's first argument, upon which the trial judge did rule,

claims that fifteen counts of dealing each based upon a separate, distinct depiction or image merge into one collective offense. Both 11 *Del. C.* § 1109(4) and § 1111(1) use the term "visual depiction" in the singular. The clearest reading of the statutes is that each individual "visual depiction" of child pornography that is knowingly "dealt" or possessed by a defendant constitutes the basis for a separate offense under the statutes. Accordingly, in this case, Fink's possession of multiple photographs depicting child pornography constituted multiple violations of both the dealing and the possession statute.[13] Each picture is a crime against the child depicted as well as an offense to society. Given the express intent of the General Assembly to prohibit dealing in individual items of material depicting child pornography, Fink's argument that he could only be charged with one download (or similarly with only one photo album where multiple pictures appear within) and therefore only one count under 11 *Del. C.* § 1109(4) or § 1111(1) fails to persuade us that the trial judge erred by denying his motion.

■ Fink's unarticulated argument, suggested by his request to dismiss 29 out of 30 counts, rests, we believe, on the theory that charging separately for both possession and dealing based on the same image constitutes double jeopardy. When the same conduct violates two statutory provisions, the first step in a double jeopardy analysis is to determine whether the legislature intended that each violation be treated as a separate offense.[14] We need

---

**11.** *Seward v. State,* 723 A.2d 365, 375 (Del. 1999).

**12.** *Id.*

**13.** *See* Appendix to Appellant's Op. Br. at 62–65 (Trial Transcript, State moving exhibits into evidence).

**14.** *Hackett v. State,* 569 A.2d 79, 80 (Del. 1990); *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

not discuss whether "possession" of child pornography pursuant to § 1111(1) constitutes a lesser included offense of "dealing" with child pornography pursuant to § 1109(4) and therefore is the "same offense" under the *Blockburger* test. The trial record reveals that over 190 images of alleged child pornography were presented to the jury. The jury could therefore have easily found that 15 different pictures met the elements of "dealing" in child pornography and 15 other pictures met the elements of "possession" of child pornography. The dealing counts were not dependent upon images or depictions necessarily used for conviction of possession of child pornography. Therefore, the rule against multiplicity was not violated because the Double Jeopardy Clause is not implicated when multiple separate violations of the two distinct statutes are charged in multiple counts.[15]

■ Fink next contends the trial judge improperly instructed the jury regarding the definition of "prohibited sexual act" as defined in 11 *Del. C.* § 1103(f). Fink's counsel, however, did not object to the instruction or proffer an alternative instruction. Therefore, we review for plain error.[16] Fink was charged with Unlawfully Dealing in Child Pornography[17] and Possession of Child Pornography.[18] Both statutes prohibit visual depictions of children "engaging in a prohibited sexual act or in the simulation of such an act." At the time of Fink's arrest in May 2000, the phrase "prohibited act" included: "(1) sexual intercourse; (2) anal intercourse; (3) masturbation; (4) bestiality; (5) sadism; (6) masochism; (7) fellatio; (8) cunnilingus; (9) nudity, if such nudity is to be depicted for the purpose of sexual stimulation or the sexual gratification of any individual who may view such depiction; (10) sexual contact."[19] In June 2000 and before Fink went to trial, the General Assembly amended the statute to include the definition "any other act which is intended to be a depiction or simulation of any act described in this subsection."[20] Fink claims the trial judge committed reversible error when his instruction to the jury included the new definition of prohibited act.

■ "The primary purpose of jury instructions is to define with substantial particularity the factual issues and clearly to instruct the jury as to the principles of law [that] they are to apply in deciding the factual issues presented in the case before them."[21] We conclude that the trial judge properly instructed the jury on the principles of law. The amended definition of "any other act which is intended to be a depiction or simulation of any act described in this subsection" added nothing the scope of Fink's criminal liability. In any event, the instruction hardly amounted to plain error. On this particular point,

---

15. *Sanabria v. United States*, 437 U.S. 54, 70 n. 24, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978) (noting that *Blockburger* does not apply when the two alleged offenses are based upon a single statute); *see also Tilghman v. State*, 2002 WL 31107054, 2002 Del. LEXIS 584 (Del.Supr.); *United States v. Stewart*, 256 F.3d 231, 247 (4th Cir.2001); *United States v. Johnson*, 130 F.3d 1420, 1426 n. 2 (10th Cir. 1997); *United States v. Kimbrough*, 69 F.3d 723, 729–730 n. 5 (5th Cir.1995).

16. *Bullock v. State*, 775 A.2d 1043, 1046 (Del. 2001).

17. 11 *Del. C.* § 1109(4).

18. 11 *Del. C.* § 1111(1).

19. 11 *Del. C.* § 1103(f).

20. 11 *Del. C.* § 1103(f)(12).

21. *Bullock*, 775 A.2d at 1047 (quoting *Zimmerman v. State*, 565 A.2d 887, 890 (Del. 1989)).

the evidence of Fink's guilt was overwhelming.

■■■■ Fink asserts that his sentence of eight years at Level V incarceration followed by thirty-five years of probation is excessive. This Court reviews sentencing of a defendant in a criminal case under an abuse of discretion standard.[22] Appellate review of a sentence generally ends upon determination that the sentence is within the statutory limits prescribed by the legislature.[23] Thus, in reviewing a sentence within statutory limits, this Court will not find error of law or abuse of discretion unless it is clear from the record that a sentence has been imposed on the basis of demonstrably false information or information lacking a minimal indicia of reliability.[24] In reviewing a sentence within the statutory guidelines, this Court will not find error unless it is clear that the sentencing judge relied on impermissible factors or exhibited a closed mind.[25]

The eight year sentence, followed by 35 years of probation falls within the 165 year statutory maximum. Thus, Fink's challenge to the sentence reduces itself to an argument that the trial judge had a "closed mind." Fink acknowledges that there are no background factors in the record besides the presentence report for this Court to review in determining whether the trial judge had a closed mind. Yet, Fink claims a review of the presentence report will clearly indicate that the defendant's background "absent this unfortu-

nate circumstance" positively supported leniency. To the contrary, nothing in the record produces even a scintilla of evidence that the judge sentenced Fink with a closed mind. Although Fink had no prior criminal record, as a practicing attorney his awareness of the unlawfulness of his conduct was clearly beyond that of an average citizen. Accordingly, we will not disturb the sentence the trial judge imposed.

■■■■ Finally, Fink contends that 11 *Del. C.* § 1109(4) and 11 *Del. C.* § 1111(1) are unconstitutional because the statutes limit allegedly protected speech. In making that challenge, Fink points to the recent decision in *Ashcroft v. The Free Speech Coalition.*[26] In *The Free Speech Coalition,* the Supreme Court considered a challenge to the Child Pornography Prevention Act of 1996 ("CPPA").[27] The statute extended the federal prohibition of child pornography to sexually explicit images that appear to depict minors but are produced without using any real children. Because the statute prohibited both protected and unprotected speech, the Court held that it was too broadly drawn and therefore unconstitutional. Despite the Court's ruling in *The Free Speech Coalition,* Congress (or in this case, the General Assembly) may prohibit transmitting pictures of pornography involving real children.[28] As Justice Kennedy observed in *The Free Speech Coalition:* "The freedom

---

22. *Cheeks v. State,* 2000 WL 1508578 (Del. Supr.) (citing *Mayes v. State,* 604 A.2d 839, 842–43 (Del.1992)).

23. *Mayes v. State,* 604 A.2d at 843 (quoting *Ward v. State,* 567 A.2d 1296, 1297 (Del. 1989)).

24. *Mayes v. State,* 604 A.2d at 843.

25. *Cheeks,* 2000 WL 1508578 (Del.Supr.).

26. 535 U.S. 234, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002).

27. 18 *U.S.C.* § 2251.

28. *See New York v. Ferber,* 458 U.S. 747, 758, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982) (upholding a law prohibiting the production, distribution, and sale of child pornography because such acts are "intrinsically related" to the sexual abuse of children).

of speech has its limits; it does not embrace certain categories of speech, including defamation, incitement, obscenity, and pornography produced with *real* children."[29] In addition, the Court's reasoning for declaring a portion of the act unconstitutional logically applies to only the virtual child pornography definitions.[30] The Court held the act unconstitutional to the extent that it regulated images that are neither obscene under *Miller v. California*[31] nor child pornography under *Ferber*.[32] Further, Fink was not charged or convicted under the federal statute, but under a state statute prohibiting possession of material that visually depicts a child engaging in sexual conduct, not merely material that "appears" to, but does not, depict a child engaging in sexual contact.[33] Finally, we note that several jurisdictions have found that *The Free Speech Coalition* applies only to virtual child pornography.[34] Accordingly, Fink's argument is without merit. The judgment of the Superior Court is affirmed.

**29.** *Free Speech Coalition*, 535 U.S. at 246, 122 S.Ct. 1389 (emphasis added).

**30.** *See United States v. Kelly*, 314 F.3d 908, 911–12 (7th Cir.)

**31.** 413 U.S. 15, 93 S.Ct. 2607, 37 L.Ed.2d 419 (1973).

**32.** *Kelly*, 314 F.3d at 911–12 (citing *The Free Speech Coalition*, 535 U.S. at 239, 256, 122 S.Ct. 1389).

**33.** *See* 11 *Del. C.* § 1109(4), § 1111(1); *Cf. Kessinger v. Cockrell*, 2003 U.S. Dist. LEXIS 738, *10 (N.D.Tex.) (distinguishing Texas stat-

ute prohibiting possession of material that visually depicts a child engaging in sexual conduct from the portion of the CPPA struck down in *Free Speech Coalition* ).

**34.** *United States v. Kelly*, 314 F.3d 908 (7th Cir.); *United States v. Maxwell*, 2002 WL 31324063, 2002 U.S.App. LEXIS (4th Cir.); *United States v. Hersh*, 297 F.3d 1233 (11th Cir.); *United States v. Davis*, 2002 WL 1754429 (3rd Cir.); *United States v. Reedy*, 304 F.3d 358, 365 n. 3 (5th Cir.2002); *Kessinger v. Cockrell*, 2003 U.S. Dist. LEXIS 738 (N.D.Tex); *Dupes v. United States*, 2002 WL 31466764, 2002 U.S. Dist. LEXIS 21297 (S.D.N.Y.).